STATE OF NEBRASKA, APPELLEE, V. JEFFRY E. MENUEY, APPELLANT.

476 N.W.2d 846

Filed November 15, 1991.   No. 90-745.

Dean S. Forney, Box Butte County Public Defender, for appellant.

Don Stenberg, Attorney General, and Mark D. Starr for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

## I. INTRODUCTION

Pursuant to verdicts, the defendant-appellant, Jeffry E. Menuey, was adjudged guilty on each of two counts of criminal nonsupport of his children, in violation of Neb. Rev. Stat. § 28-706 (Reissue 1985). He was thereafter sentenced on the first count to imprisonment for a period of 1 year and on the second count to probation for a period of 5 years. He assigns as error the district court's (1) failure to find the evidence insufficient to support the verdicts, (2) failure to find that the presence during the jury's deliberations of a discharged alternate juror "violates the verdict," and (3) imposition of an excessive sentence. We affirm.

## II. FACTS

Defendant and Marilynn Menuey were married on June 6, 1969, and divorced on December 2, 1983, after producing two sons: Lance Aaron, 19 years of age at the time of the subject trial, which was held May 29 and 30, 1990, and Jay Ryan, 15 years of age. Prior to the divorce and up until his resignation on

July 20, 1987, defendant was employed as a conductor by Burlington Northern Railroad, worked out of Alliance, Nebraska, and earned approximately $38,000 a year.

The divorce decree gave the parties joint custody of the boys and required defendant to pay the sum of $300 per month for the support of his two sons. A modification order entered September 4, 1986, gave full custody to the former wife and provided that defendant was to pay $380 in child support ($190 for each boy) during the months of October through December 1986, and beginning in January 1987, $570 per month. This order further required him to notify the district court of any changes in his address, telephone number, Social Security number, and employer.

Defendant has made no support payments since August 1, 1987, except for $1,125.88 paid on February 13, 1990, from the proceeds of a sheriff's sale of his automobile. As of the time of trial, defendant owed $18,083.65 in delinquent child support. Neither did the defendant keep the court advised of his whereabouts or of the changes in his employment status.

During the 3 intervening years between the entry of the divorce decree and the modification order, defendant was active in his sons' lives. He coached their sports teams and maintained a strong relationship with them. Defendant testified, however, that following the modification order and his former wife's successful bid to gain full custody of the boys, his relationship with the boys deteriorated.

Defendant's principal defense for his failure to pay child support and to notify the court of his whereabouts and employment status rests on his assertion that following the modification order, he became so upset about no longer being able to see his sons on a regular basis and his former wife's attempts to garnish his wages that he became mentally and emotionally incapable of functioning, to the point that his work suffered. He also claims that his decision to terminate his employment and leave Alliance was not an attempt to avoid child support but, rather, to solve his emotional problems.

Several witnesses testified regarding defendant's depressed state after his loss of joint custody. A fellow employee stated that defendant's relationship with his boys went "downhill"

and that he was "[d]epressed, distraught, he just wasn't himself." This coworker's wife testified that "[m]ental-wise [defendant] just couldn't function. He was very, very disturbed." Another fellow employee and friend of the defendant claimed that defendant was "very emotionally distraught, [he] is normally a very outgoing person." Defendant's mother said he was "[d]own in the dumps, depressed, unhappy, just everything, he didn't know what to do." According to defendant's father, defendant told him he "was going crazy . . . he didn't know whether to shot [sic] himself."

On May 28, 1987, defendant went on a 30-day leave of absence from his Burlington Northern employment. During this leave, he and his present wife, whom he married on September 17, 1985, traveled to Canada, Washington, Oregon, Mexico, and Arizona. Near the end of his leave, defendant decided he could not go back to Alliance because of "the pressures that had built upon us," explaining that

> [a]ll the people that I had known all my life had been alienated against me, I felt nobody understood what I was trying to tell them, the concerns with my kids, everything else, I just felt if I came back I'd be in the same position I was in when I left.

While on leave from Burlington Northern, defendant searched for and found other work. In June 1987, he interviewed with a prospective employer in Seattle, Washington, and then traveled to its headquarters at Tucson, Arizona. He was offered a job, but found it would not be available until September 30, 1987. Consequently, he rejected that offer and instead took a job with another employer around July 20 or 25, 1987. He began at $4.25 an hour and eventually earned $6 an hour for a 40-hour week. He worked with that employer until it closed on December 22 or 23.

In January 1988, defendant and his present wife traveled to Corpus Christi, Texas, where he was offered a position with a Boston, Massachusetts, employer. The couple began traveling to Boston, but stopped in Alabama to visit his present wife's oldest daughter. While there, defendant contacted the Boston company and was told his job had been eliminated.

Defendant then secured his most recent job on February 4, 1988, as a laborer for an Alabama employer. Defendant was paid $4.20 an hour for a 40-hour week and remained so employed until January 5, 1990, when he resigned, a week after he was arrested. Thus, during the approximately 2½ years that defendant was gone from Alliance, he was employed for all but the months of June and July 1987 and January 1988.

The former wife contends that defendant's motive for leaving Alliance and cutting off contact with people in the community was to avoid paying the modified child support. According to her, defendant "said that if anyone tried to make him pay more than $300, he would just leave and [she] would never be able to get a dime and [she] would never be able to do nothing about it." The older boy testified that his father said "if my mother kept harassing him, he would just pack up and leave and we would never hear from him again." The defendant denied these accusations. However, in a letter to his supervisor at Burlington Northern, he wrote: "I feel that I can no longer work for a company that allows an ex-spouse to garnishe [sic] my paycheck at will for any whim she choses [sic]. . . . I am better off working for a non-corporation." On two occasions prior to defendant's leaving Burlington Northern, the former wife sought to garnish his wages. She was successful the first time; the second time she was not.

During the defendant's and his present wife's travels, defendant made no child support payments, claiming he did not make enough money. According to his testimony, he earned approximately $21,000 in 1987, approximately $12,000 in 1988, and $16,400 in 1989. The former wife has been the sole financial provider for the two boys since July 1987. The older son testified that the last time he saw defendant was on December 25, 1986, and the last time he talked to him was on January 12, 1987. Since that time, the boys have received neither money nor mail from defendant. Nonetheless, defendant claims he never tried to conceal his whereabouts from the former wife. He admitted, however, that he knew at all times how much he owed in child support and that he knew he was required by law to pay as ordered, but he made no attempt to modify or reduce his support obligation.

When the case was submitted to the jury shortly before noon, the district court discharged the alternate juror. Absurdly enough, the bailiff nonetheless invited the alternate to have lunch with the jurors. In preparing to embark for lunch, several of the jurors and the alternate returned to the jury room to leave some items and retrieve others. According to the alternate, no discussion of the case took place at this time. Both the bailiff and the alternate testified that the case was not discussed either during lunch or on the return trip to the courthouse. Upon returning to the jury room after lunch, the alternate inquired of the bailiff whether he could remain with the jury during its deliberations. The bailiff thereupon proceeded to the district court judge's office to inquire; upon his return, approximately 5 to 10 minutes later, he told the alternate that he could not remain. The alternate then departed. The alternate also testified that while he was in the jury room after lunch, he sat behind the jurors, and although he heard their discussions, he did not participate in them.

Ten of the jurors testified that there was no talk about the case over lunch, the alternate did not participate during the approximately 10 minutes that he was in the jury room while they chose a foreman, and their decisions were not in any way influenced by the alternate's presence. Some of these jurors testified that the alternate did not participate while they deliberated, while several other jurors of this group stated that the case was not discussed during the time the alternate was in the jury room, as they spent the time choosing a foreman. The parties stipulated that the two remaining jurors, if called, would testify that the alternate neither participated in the case nor influenced them in their decisions. After the alternate departed, the jurors deliberated for approximately 45 minutes before agreeing upon their verdicts.

### III. ANALYSIS

With that background, we turn our attention to defendant's assignments of error.

#### 1. SUFFICIENCY OF EVIDENCE

Defendant attempts to support his first assignment of error, which claims the verdicts are not supported by the evidence, by

the simple, and faulty, expedient of focusing on certain evidence and ignoring the rest. He relies only on testimony which suggests that he left Alliance and his longtime employment with Burlington Northern because he became depressed over his deteriorating relationship with his children. He concludes that it therefore cannot be said he willfully refused to comply with the modification order.

Even if the testimony on which defendant centers his attention supports his conclusion, a matter we do not decide, defendant's contention fails to take into account the evidence which indicates that he left his employment and the area, and neglected to keep the court advised of his whereabouts, because he had become aware by the garnishments that he could otherwise be made to comply with the modification order, a circumstance that he determined he would not permit to happen.

The resolution of this assignment of error is therefore controlled by the oft-cited rule that in determining the sufficiency of the evidence to support a finding of guilt in a criminal case, this court does not resolve conflicts in the evidence, determine the plausibility of explanations, or weigh the evidence, such matters being for the finder of fact, whose findings must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support them. *State v. Winchester, post* p. 535, 476 N.W.2d 862 (1991); *State v. Byam, ante* p. 186, 474 N.W.2d 688 (1991). There is more than sufficient evidence to support a finding that defendant is and has always been able-bodied and capable of earning at a rate sufficient to enable him to support his children as directed in the modification order and that he simply elected, for reasons of his own, not to do so. See *Knippelmier v. Knippelmier*, 238 Neb. 428, 470 N.W.2d 798 (1991). Thus, the evidence supports the verdicts, and the first assignment of error fails.

## 2. Presence of Discharged Alternate

The assertion presented in defendant's second assignment of error, that the presence of the alternate during the jury's deliberations "violates the verdict," is more correctly expressed

as a claim that the situation deprived defendant of his due process right to a fair and impartial trial. See *Simants v. State*, 202 Neb. 828, 277 N.W.2d 217 (1979).

### (a) Right to Bias- and Prejudice-free Jury

U.S. Const. amend. VI provides that in "all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." Neb. Const. art. I, § 6, guarantees the right of trial by a 12-person jury in the district court. Neb. Const. art. I, § 11, further guarantees one accused of a crime "a speedy public trial by an impartial jury . . . ." Consequently, an accused is "guaranteed a fair trial by an impartial jury." *Kirchman v. State*, 122 Neb. 30, 32, 239 N.W. 207, 208 (1931). See *Fugate v. State*, 169 Neb. 420, 99 N.W.2d 868 (1959).

To help ensure that an accused receives a fair and impartial trial, the Legislature has provided statutory guidelines regarding jury procedure and conduct. Neb. Rev. Stat. § 29-2004 (Reissue 1989) provides that "alternate jurors shall also be kept with the other jurors and, except as hereinafter provided, shall be discharged upon the final submission of the cause to the jury." Neb. Rev. Stat. § 29-2022 (Reissue 1989) provides, in effect, that once the case has been submitted, the jury shall have no communication with nonjurors.

### (b) Status of Discharged Alternate

The first question which comes to mind is: What is the status of a discharged alternate juror? The Massachusetts Supreme Court, in *Commonwealth v. Smith*, 403 Mass. 489, 494, 531 N.E.2d 556, 559 (1988), answered: " '[A]lternate jurors,' as long as they remain alternates, really are not jurors. When they attend jury deliberations they do so as mere strangers."

The Ohio Court of Appeals, in relying on *Potter v. Perini*, 545 F.2d 1048 (6th Cir. 1976), declared that since "an alternate juror is not part of the deliberating body, he should not be permitted to be with the group, as he may have an influence on their determination." *State v. Blair*, 34 Ohio App. 3d 6, 8, 516 N.E.2d 240, 242 (1986). See, also, *State v. Scrivner*, 676 S.W.2d 12 (Mo. App. 1984) (finding presence of alternate juror was error but harmless); *State v. Coulter*, 98 N.M. 768, 652 P.2d

1219 (N.M. App. 1982) (finding presence of alternate juror creates presumption of prejudice); *Luster v. State*, 515 So. 2d 1177, 1180 (Miss. 1987) ("alternate jurors are to be discharged in accord with the statute and are not to be present or participate in deliberations under any circumstances not prescribed by statute").

The significance of a right to an impartial 12-person jury has also been addressed by other jurisdictions. The U.S. Supreme Court has announced that an accused has a right to have a jury deliberate its verdict in secrecy. *Clark v. United States*, 289 U.S. 1, 53 S. Ct. 465, 77 L. Ed. 993 (1933). The U.S. Court of Appeals for the 10th Circuit, in holding that an accused's right to an impartial jury had been violated, wrote:

> Once these proceedings [have] commenced, "the jury" consisted only of the prescribed number of jurors. The alternate then became as any other stranger to the proceedings regardless of whether she had been discharged. . . .
>
> . . . .
> Once the prescribed number of jurors becomes "the jury," then, and immediately, any other persons are strangers to its proceedings. Their presence destroys the sanctity of the jury . . . .

*United States v. Beasley*, 464 F.2d 468, 469-70 (10th Cir. 1972). The Supreme Court of Colorado, whose Constitution, like ours, requires a jury of 12, has stated that " 'twelve is the magic number,' " and no rule provides for more than 12 jurors. *People v. Boulies*, 690 P.2d 1253, 1256 (Colo. 1984).

### (c) Effect of Unauthorized Presence

There can thus be no question that the bailiff's inexplicable misconduct violated defendant's federal and state constitutional rights to a fair and impartial trial. The controlling question becomes whether that violation compels reversal of his convictions.

In *Simants v. State*, 202 Neb. 828, 277 N.W.2d 217 (1979), the sheriff, who also testified as a material witness, fraternized with the jurors during sequestration. The trial court found the communications unwarranted, but ruled they did not rise to a

level prejudicing the accused. In reversing, this court observed that "when an improper communication with a juror or jurors is shown to have taken place in a criminal case, a rebuttable presumption of prejudice arises and the burden is on the State to prove that the communication was not prejudicial," *id.* at 835, 277 N.W.2d at 221, saying:

> The foundational basis for the rule of presumptive prejudice is that a fair trial in a fair tribunal is a basic requirement of constitutional due process. The reasons for the rule have been variously expressed by the courts.
> " 'The verdict of a jury * * * should represent the concurring judgment, reason and intelligence of the entire jury, free from outside influence from any source whatever.' " *Bramlett v. State*, 129 Neb. 180, 261 N.W. 166 [(1935)].

*Simants, supra* at 836-37, 277 N.W.2d at 222. The *Simants* court also declared that the occurrence of unauthorized private communications was forbidden and would invalidate the verdict unless it was shown to be harmless error. In other words, *Simants* concluded that not all errors, even if of constitutional magnitude, entitle an accused to the reversal of an adverse trial result; it is only a prejudicial error, that is, an error which cannot be said to have been harmless beyond a reasonable doubt, which requires that a conviction be set aside. *State v. Hartmann, ante* p. 300, 476 N.W.2d 209 (1991); *State v. Green*, 238 Neb. 492, 471 N.W.2d 413 (1991); *State v. Chapman*, 234 Neb. 369, 451 N.W.2d 263 (1990); *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). See, also, *State v. McDonald*, 230 Neb. 85, 430 N.W.2d 282 (1988).

*State v. LeBron*, 217 Neb. 452, 349 N.W.2d 918 (1984), applied the same doctrine in determining that LeBron had not been prejudiced by the fact that two jurors had overheard the judge and his law clerk discussing the case. See, also, *Sunderland v. United States*, 19 F.2d 202 (8th Cir. 1927) (juror conversing with witness).

In *Gandy v. State*, 24 Neb. 716, 40 N.W. 302 (1888), the court officer having charge of the jury sat in on a portion of the jury's deliberations. The *Gandy* court, in following *People v. Knapp*,

42 Mich. 267, 3 N.W. 927 (1879), adopted the rule that the officer's mere presence in the jury room deprived the jury of the opportunity for private and confidential discussion and was thus grounds for automatic reversal. In so holding, this court wrote in *Gandy, supra* at 727, 40 N.W. at 306:

> It is the policy of the law that the verdict of every jury shall be reached by free and deliberate consultation, without bias or prejudice, and be based upon the evidence. The evidence is to be carefully weighed, the instructions to the court considered, and a conclusion reached which shall satisfy each member of the jury. This can only be had by preventing an intrusion for any considerable time by the bailiff, or others, while the jury are considering their verdict.

The same view was reiterated in *Cooney v. State*, 61 Neb. 342, 85 N.W. 281 (1901), wherein the sheriff and officer having charge of the jury remained with the jury during several hours of deliberations. The *Cooney* court found that while neither party participated nor advised the jury in any manner, their presence had deprived Cooney of a substantial right. However, the *Cooney* court noted that "the presence of" a court officer "or other intruder in the jury room for a short time while the jury are deliberating, will [not] in every case vitiate the verdict rendered . . . ." *Id.* at 344, 85 N.W. at 282. The *Cooney* court thus recognized that not every intrusion into the jury room automatically results in prejudice to an accused. It is only those intrusions which result in prejudice to an accused, that is, intrusions into the jury room by third parties of a nature which cannot be said to have been harmless beyond a reasonable doubt, which require that a conviction be set aside.

The presence in the jury room of a discharged alternate juror is qualitatively different from the presence of a court officer or of a law enforcement officer, as occurred in *Gandy* and *Cooney*. A court officer might be expected to be present to monitor the jury's discussions for some purpose of the court; the presence of a law enforcement officer could be expected to inhibit criticism of the State's case. The presence of both a court officer and a law enforcement officer increases the inhibitory effect. However, a discharged alternate juror represents neither

the State nor the court. Thus, although the presence of such an alternate in the jury room constitutes an unwarranted intrusion upon the jury and is to be guarded against, not every such intrusion requires a new trial. The uncontradicted evidence in this case, if properly received, establishes that the alternate's presence did not prejudice defendant. We thus move on to a consideration of that question.

(d) Receipt of Evidence of Outside Influence

Neb. Rev. Stat. § 27-606(2) (Reissue 1989) provides that a juror may not be questioned about any "matter or statement occurring during the course of the jury's deliberations," but may testify regarding whether any "outside influence was improperly brought to bear upon any juror." In *State v. Roberts*, 227 Neb. 489, 493, 418 N.W.2d 246, 249 (1988), we held that § 27-606(2) "controls inquiries into the validity of a verdict reached by a jury." The trial judge in *State v. LeBron*, 217 Neb. 452, 349 N.W.2d 918 (1984), upon discovering the overheard conversation described in part III(2)(c) above, examined the jurors to determine whether they were nonetheless capable of rendering a fair and impartial verdict and, in refusing to declare a mistrial, concluded that there was no prejudice to LeBron. We affirmed. The Missouri courts have also found convincing affidavits by jurors establishing that they were not influenced by a discharged alternate juror's presence. *State v. Scrivner*, 676 S.W.2d 12 (Mo. App. 1984).

We thus conclude that the evidence concerning the effect of the discharged juror's unauthorized presence was properly received. Consequently, there is no more merit to defendant's second assignment of error than there is to his first.

### 3. SENTENCES

Neither is there any merit to his third and final assignment of error, which claims the prison sentence is excessive.

Violations of § 28-706 are Class IV felonies, punishable by imprisonment for up to 5 years, a $10,000 fine, or both such imprisonment and fine. See Neb. Rev. Stat. § 28-105 (Reissue 1985). We say again that sentences imposed within the statutorily prescribed limits will not be disturbed on appeal absent an abuse of discretion. *State v. Winchester, post* p. 535,

476 N.W.2d 862 (1991); *State v. Witt, ante* p. 400, 476 N.W.2d 556 (1991); *State v. Hartmann, ante* p. 300, 476 N.W.2d 209 (1991).

As we have also noted before, the failure to support one's children is a grave and ignoble offense and is to be treated as such. *State v. Reuter*, 216 Neb. 325, 343 N.W.2d 907 (1984). The district court did not abuse its discretion.

## IV. DECISION

Since the record sustains none of defendant's assignments of error, the judgment of the district court is affirmed.

AFFIRMED.