STATE OF NEBRASKA, APPELLEE, V. THOMAS M. NISSEN, ALSO KNOWN AS MARVIN T. NISSEN, APPELLANT.

560 N.W.2d 157

Filed March 14, 1997.    Nos. S-95-996, S-95-997.

Peter K. Blakeslee for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, and GERRARD, JJ., and BURKHARD and CASSEL, D. JJ.

54

PER CURIAM.

## STATEMENT OF CASE

The plaintiff-appellee, State of Nebraska, charged the defendant-appellant, Thomas M. Nissen, also known as Marvin T. Nissen, in case No. S-95-996 with three counts of murder in the first degree, in violation of Neb. Rev. Stat. § 28-303 (Reissue 1995), and in case No. S-95-997 with burglary, in violation of Neb. Rev. Stat. § 28-507 (Reissue 1995). The cases were consolidated for trial, and pursuant to verdict, Nissen was thereafter adjudged guilty in the first case of one count of murder in the first degree and two counts of murder in the second degree, in violation of Neb. Rev. Stat. § 28-304 (Reissue 1995), and in the second case, of burglary. He was thereafter sentenced to imprisonment for life for each of the murders, the sentences to be served consecutively; to pay a fine of $25,000; and to imprisonment for a period of 20 years for the burglary, said sentence to be served consecutively to those imposed in the first case.

## BACKGROUND

On December 25, 1993, one "Brandon," while at the home of Linda Gutierres, complained of having been assaulted to Chief Norman Hemmerling of the Falls City Police Department, who had responded to a call from one of Brandon's acquaintances. Brandon was not previously unknown to law enforcement personnel. She had been cited for forgery in Lancaster County, and a forgery charge was currently pending against her in Richardson County. In addition, she had falsely identified herself in traffic stops as Charles Brayman.

Seeing injuries consistent with a physical assault, Hemmerling had Brandon transported to a local hospital, where it was learned that Brandon was a female, Teena Brandon. At this point, Brandon complained that she had been sexually assaulted and kidnapped by Nissen and John Lotter. Although evidence suggesting a sexual assault on Brandon was discovered, and notwithstanding that on December 28, Nissen admitted that he had physically assaulted her, no charges were filed against either Nissen or Lotter.

On December 31, Brandon and two others, Lisa Lambert and Phillip DeVine, were found dead at Lambert's Richardson

County farmhouse. All three had been shot, and Brandon had been stabbed as well.

Reflecting on the investigation of Brandon's claims concerning the assault upon her, Assistant Chief John Caverzagie and other law enforcement personnel went to Nissen's house and arrested both Nissen and Lotter.

## ASSIGNMENTS OF ERROR

In challenging his convictions, Nissen assigns 17 errors, which are summarized as claiming that the trial judge erred in (1) overruling Nissen's amended motion to quash, (2) overruling Nissen's motion to suppress certain evidence, (3) overruling Nissen's motion for mistrial during jury selection, (4) admitting certain evidence, (5) overruling Nissen's postevidence motions to dismiss certain of the charges, (6) improperly instructing the jury, (7) overruling Nissen's motion for mistrial because of misconduct during the jury's deliberations, and (8) imposing an improper sentence for the burglary conviction.

## ANALYSIS

We supply with the analysis of each assignment of error such additional facts as are relevant thereto.

*Motion to Quash.*

As argued, Nissen urges in the first summarized assignment of error that the trial judge wrongly overruled his amended motion to quash the State's operative information improperly charging the murders under five separate theories of guilt.

As the amended motion to quash questions the validity of the operative information, the issue presented by this assignment of error is one of law, in connection with which we, as a reviewing court, have an obligation to reach our own conclusion independent of those reached by the lower courts. See, *Hynes v. Hogan*, 251 Neb. 404, 558 N.W.2d 35 (1997); *State v. Kennedy*, 251 Neb. 337, 557 N.W.2d 33 (1996).

The operative information charges that Nissen committed purposeful murder under the provisions of § 28-303(1) or felony murder under § 28-303(2) by his having broken and entered with the intent to perpetrate the felonies of first degree assault, second degree assault, first degree false imprisonment, or tampering with a witness.

Section 28-303 provides that one commits murder in the first degree if one kills another "(1) purposely and with deliberate and premeditated malice, or (2) in the perpetration of or attempt to perpetrate any . . . burglary . . . ." Section 28-507(1) provides that one commits burglary if one "willfully, maliciously, and forcibly breaks and enters any real estate or any improvements erected thereon with intent to commit any felony . . . ." Neb. Rev. Stat. § 28-206 (Reissue 1995) provides that one who "aids, abets . . . another to commit any offense may be prosecuted and punished as if he were the principal offender." One aids and abets a crime by mere encouragement or assistance; physical participation in the crime is not required. *State v. Brunzo*, 248 Neb. 176, 532 N.W.2d 296 (1995); *State v. Sanders*, 241 Neb. 687, 490 N.W.2d 211 (1992).

Nonetheless, Nissen's premise is that an information such as presented here impermissibly allowed the jury unanimously to find him guilty of first degree murder without requiring it to reach unanimous agreement as to whether the killing was purposeful murder under § 28-303(1) or felony murder under § 28-303(2), and without requiring the jury, in the latter instance, to reach unanimous agreement on the existence of all the elements of any one of the several underlying felonies alleged.

However, this premise was rejected in *State v. Buckman*, 237 Neb. 936, 468 N.W.2d 589 (1991). We reasoned therein that as under § 28-303 murder may be committed either by killing purposefully or in the commission of a felony, and as the charge arises under one set of facts, it is sufficient if there is evidence to support each of the methods. Thus, the jury need be unanimous only in its finding that the defendant violated § 28-303 by committing murder; it need not be unanimous concerning under which of the consistent theories the murder was committed.

The record fails to sustain this assignment of error.

*Motion to Suppress.*

Nissen argues in the second summarized assignment of error that the trial judge mistakenly overruled his motion to suppress the statements he gave on December 31, 1993, and January 2, 1994, because they were the fruit of Nissen's unlawful arrest, deception, improper inducement, and impermissibly prolonged detention.

The evidence adduced at the suppression hearings was that at approximately 2 a.m. on December 25, 1993, Nissen and Lotter went to the home of Gutierres to recover $6 from DeVine, the boyfriend of Gutierres' daughter, Leslie Tisdel. They told Gutierres that during a party at Nissen's house, they had proved to Gutierres' other daughter, Lana Tisdel, that Brandon was not male, as she had been representing herself, but female. Lotter had held Brandon while Nissen pulled her pants down in Lana Tisdel's presence, exposing a sock between Brandon's legs.

At 6 a.m. on December 25, Brandon appeared at Gutierres' house, and Gutierres saw that Brandon's face, lip, and jaw were swollen and bleeding and that her right back was reddened. Leslie Tisdel summoned the police, and Hemmerling responded.

Brandon was transported to the local hospital by ambulance, where she identified herself as Teena Rae Brandon and reported that she had been assaulted. Because on a prior occasion Brandon had represented herself to hospital personnel as male, they asked her to remove her clothing so that they could determine her gender. At this time, Brandon's demeanor changed from a very solemn state to an emotional one; although no mention of any sexual assault had been made, and it was the first mention in Hemmerling's presence, Brandon asked, "Who told you I was raped?" Examination revealed that she appeared to be bleeding from her vagina in the area of the hymen, a condition which suggested that vaginal penetration had occurred. Brandon named Nissen and Lotter as her attackers and said she believed that they had used condoms.

According to Hemmerling, Brandon said at the hospital that the two had raped and beaten her at two separate locations and that an automobile accident had intervened between the attacks. She reported that one attack took place in the back seat of an automobile in a field north of town by the Hormel plant. She denied any anal penetration and said she had been assaulted because of a dispute about a bond that had been posted for her. When they returned to Nissen's house, Brandon escaped by kicking out a bathroom window.

Hemmerling and Officer Sean Nolte later confirmed that the bathroom window had been broken out of Nissen's house. On

December 25, Richardson County Sheriff Charles Laux and Chief Deputy Thomas Olberding found two used condoms, a condom package, an empty Busch beer can, and a pair of rolled-up socks near the Hormel plant.

In the meantime, Caverzagie had seen Nissen at 1:10 a.m. at the police station on December 24, 1993. At that time, Nissen told Caverzagie that at Lana Tisdel's request, he had posted a bond to get Brandon out of jail and was trying to have the bond revoked. Nissen said that the money he used was obtained as the result of Lana Tisdel's changing the amount on and cashing a check from her father. He was afraid the father would be after him if Brandon should abscond. Nissen asked Caverzagie if he would get in trouble if he tied her up or forced her to stay at his house, as he wanted to keep Brandon from fleeing. As he left the police station, Nissen stated that he had discovered Brandon was female when he pulled her pants down and "felt the hair" or "fur."

In the written statement Brandon gave officers following interviews on December 25, 1993, she did not recite that she was assaulted at two locations and did not mention anal penetration. However, when talking to the interviewing officers, she said that Nissen may have penetrated her anally. According to Gutierres' statement, Brandon had told Gutierres' daughters that she had been both vaginally and anally assaulted. Because of concerns about inconsistencies in her version of the occurrence, Olberding scheduled another interview with Brandon during the afternoon of December 29, but Brandon did not keep the appointment.

On December 28, Nissen voluntarily went to the police station and, after being read his *Miranda* rights, gave a statement to police investigator Keith Hayes and Olberding. Nissen reported that he had been drinking alcoholic beverages, including either Miller, Busch Light, or Busch beer. He also admitted that he pulled Brandon's pants down at his house to determine what sex she was. He further revealed that during an argument at his house over Brandon's lying about her gender, he hit her in the mouth, slapped her cheek, and after she fell to the floor, kicked her in the back. In addition, Nissen confessed that when in the area of the Hormel plant, he punched Brandon in the

stomach. However, he denied that he had sexually assaulted Brandon or had forced her out of his house and into the automobile for the trip to the Hormel plant against her will. Nissen was allowed to leave at the conclusion of the interview.

On December 30, 1993, Caverzagie read the investigative reports prepared by Hemmerling, Nolte, and Hayes and the statements given by Brandon, Gutierres, Leslie Tisdel, and Lana Tisdel, then went home to sleep.

At approximately 10 a.m. on December 31, the victims of the murders at issue were discovered, and Caverzagie was called to work by the dispatcher. Later that day, Caverzagie, Hayes, Hemmerling, other members of the police department, Olberding, and Nebraska State Patrol Investigator Roger Chrans met at the police station.

Caverzagie was initially told that there had been warrants issued for the arrest of Nissen and Lotter and that he was to assist in making the arrests and perhaps in conducting a search. According to Caverzagie, the purpose of all the officers meeting at the police station that day was to execute search and arrest warrants. But once Caverzagie arrived at the station, Hemmerling told him that warrants had not been issued. Before leaving for Nissen's house, Caverzagie reviewed the physician's report, the photographs Hemmerling had taken of Brandon at the hospital, a photograph of Nissen's house, and two statements given by Lotter's girl friend.

At 4:15 p.m. on December 31, the officers surrounded Nissen's house and arrested both Nissen and Lotter. According to Caverzagie's report, he and "Officer Cowan then transported . . . Nissen to the Richardson County Sheriff's Office. He was also booked in for first-degree sexual assault and arrested as per warrant and lodged in the Richardson County Jail." When questioned as to why the report reflected that the arrests were made as the result of warrants, Caverzagie testified that he guessed it was "probably a habit or a paper glitch."

However, other law enforcement personnel believed that Nissen's arrest took place as per warrant. Chrans said that he would not have been at the arrest if he had known that warrants had not been issued. Hayes stated that he believed the warrants had been signed when they went to make the arrests. Moreover,

Hayes contradicted Caverzagie's statement that he knew there were no warrants by testifying that Caverzagie confided after the arrests that he was concerned because County Attorney Douglas Merz had recently told Caverzagie that the warrants had possibly not been obtained prior to the arrests. Hayes believed Caverzagie told him that he believed at the time he made the arrests that he was relying on existing warrants. Caverzagie has no memory of such a conversation.

As Olberding was returning from assisting in the arrests, he was met in the courthouse parking lot by Merz, who asked Olberding to accompany him to a hearing before Richardson County Judge Curtis Maschman. At the hearing, which began at 5:23 p.m. on December 31, 1993, Olberding swore to the accuracy of Merz' affidavit in support of his application for an arrest warrant, notwithstanding that Nissen had already been arrested and was in custody at the courthouse. When asked in his deposition what he thought of obtaining arrest warrants for persons who were already in custody, Olberding stated that he thought it was unusual and assumed that Merz was simply "covering law enforcement's ass."

Merz' affidavit recited that Brandon claimed that on December 25, Nissen physically attacked her and forced her into an automobile driven by Lotter, and both Nissen and Lotter then subjected her to nonconsensual sexual penetration. Olberding did not inform the county judge that Nissen was already in custody. Neither did Merz advise the county judge of Brandon's prior criminal history or that Nissen was already in custody and in the building. Merz claims that at the time, he did not know that Nissen was already in custody. The county judge was given no information concerning Brandon's prior history, her contradictory statements concerning the assault, her past false identification and statements to police officers, or Nissen's denial that he had sexually assaulted Brandon.

The county judge issued a warrant for Nissen's arrest for aiding and abetting a first degree sexual assault and kidnapping on December 25, 1993, and Olberding served it upon Nissen.

At around 10:15 p.m. on December 31, Hayes and Chrans interviewed Nissen after he was advised of his *Miranda* rights and had signed a waiver form. According to Chrans, Nissen was

coherent, did not refuse to cooperate, did not ask for an attorney, and at no time indicated a desire to remain silent. Although the jailer recalled no such requests, Nissen claims that in spite of his one or two requests that he be allowed to make telephone calls before giving the December 31 statement, such was not permitted. Nissen further claims that he was not allowed to make any telephone calls after the December 31 statement, stating that it was 3 or 4 days before he was allowed to make such calls. In addition, although denied by the investigators, Nissen testified that he was told by Hayes on December 31 that giving a statement would help him down the line. Chrans falsely told Nissen they knew he had told his wife to lie about the time he returned home on the night of the murders.

In the December 31 statement, Nissen said that he drove Lotter to the farmhouse to scare Brandon for filing the sexual assault complaint against them. When asked whether he and Lotter had killed the people found at the farmhouse, Nissen nodded his head up and down and quietly said yes. He provided a detailed description of the time he and Lotter spent together before the killings and described the killings in detail. For example, Nissen explained that after he and Lotter had left a bar, he drove to his house, and after he ate, he drove Lotter around and stopped at another house where Lotter picked up a gun stored in a box. Lotter said he wanted to take care of Brandon, and Nissen replied not to hurt anyone else. Nissen drove to what he described as Brandon's house, arriving at about 2 o'clock in the morning. Wearing gloves, they broke in through the front door. They found Lambert, who was then unknown to Nissen, lying in a bed and a baby nearby in a crib. Nissen picked up and held the baby to quiet it, gave it to Lambert when Lambert asked, and later took the baby from Lambert and again put the baby in the crib. Brandon was on the floor trying to hide. After a loud discussion between Brandon, Nissen, and Lotter, Lotter shot Brandon. Upon being asked by Nissen, Lambert said that DeVine was in the house, after which Lotter shot her. DeVine was taken into the living room, where Lotter shot him as well. The baby was left alive. The events took about 10 minutes, and Nissen drove back to his house, arriving at about 3 o'clock that morning. On the drive to his house, a pair

of gloves, the box, and the gun were thrown over a bridge, and the other pair of gloves was tossed out after passing the bridge. As a result of this statement, law enforcement personnel, in the early morning of January 1, 1994, recovered a pair of gloves, a pistol, a box, and a knife and knife sheath. Subsequent analysis showed the knife to have been bloodied.

.   The statement taken at approximately 7:10 on the evening of January 2 essentially repeated the information Nissen provided on December 31. However, the second statement added some details, such as that Lotter had shown Nissen a knife on the drive to the Lambert farmhouse. Nissen also made a drawing of the bedroom where Brandon and Lambert were killed, and on a drawing made by Hayes marked where Nissen parked his automobile and the location of the door through which he and Lotter entered the Lambert farmhouse.

*Nature of Arrest.*

We cannot, and do not, countenance the manner in which the warrant for Nissen's arrest was obtained. While not a constitutional prerequisite for jurisdiction of courts of the State of Nebraska, existence of an actual case or controversy, nevertheless, is necessary for the exercise of judicial power in Nebraska. *State v. Baltimore*, 242 Neb. 562, 495 N.W.2d 921 (1993). The doctrine of mootness is a key component in determining whether an actual case or controversy exists. *Jaksha v. State*, 241 Neb. 106, 486 N.W.2d 858 (1992). A moot case is one which seeks to determine a question which does not rest upon existing facts or rights, in which the issues presented are no longer alive. *State v. McCormick*, 246 Neb. 890, 523 N.W.2d 697 (1994).

In *Abram v. State*, 606 So. 2d 1015 (Miss. 1992), warrants were issued for the arrest of Abram on two charges of capital murder and one charge of armed robbery. The sheriff arrested and took Abram into custody that same day. However, the sheriff did not serve the warrants on Abram until 3 days after the arrest. Abram challenged the legality of the arrest, asserting that there was not probable cause for the warrants to issue. However, the court determined that the issue for consideration was whether the sheriff had probable cause to arrest Abram notwith-

standing the warrants. The court reasoned that the "validity of the warrants is a moot point . . . since Abram was not technically arrested by warrant until . . . three days after he was functionally arrested without a warrant." *Id.* at 1025.

Likewise, once Nissen was arrested and placed in custody, the issue as to whether there existed probable cause to issue a warrant for his arrest became a moot point. As a result, the court could not properly exercise judicial power to conduct the arrest warrant hearing. See *State v. Baltimore, supra.* We thus consider Nissen's arrest to have been effected without a warrant and further consider the arrest to have taken place when he was first taken into custody at his house.

The provisions of both U.S. Const. amend. XIV and Neb. Const. art. I, § 7, protect against unreasonable seizures. See *State v. Konfrst,* 251 Neb. 214, 556 N.W.2d 250 (1996) (reasonableness of search). Thus, an arrest without a warrant can be valid only if there existed at the time probable cause to believe both that a felony has been committed and that the person arrested committed it. See, *State v. Russ,* 193 Neb. 308, 226 N.W.2d 775 (1975); Neb. Rev. Stat. § 29-404.02 (Reissue 1995). Moreover, when law enforcement personnel have acted without a warrant, the burden is upon the State to prove that the arrest was reasonable. See *State v. Vermuele,* 241 Neb. 923, 492 N.W.2d 24 (1992) (reasonableness of search).

In reviewing a trial court's ruling on a motion to suppress, we review the ultimate determination of probable cause de novo and review the findings of fact made by the trial court for clear error, giving due weight to the inferences drawn from those facts by the trial court. *Ornelas v. United States,* 517 U.S. 690, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996); *Konfrst, supra.*

It must also be borne in mind that when a law enforcement officer has knowledge, based on information reasonably trustworthy under the circumstances, which justifies a prudent belief that a suspect is committing or has committed a crime, the officer has probable cause to arrest without a warrant. *State v. Van Ackeren,* 242 Neb. 479, 495 N.W.2d 630 (1993), *cert. denied* 510 U.S. 836, 114 S. Ct. 113, 126 L. Ed. 2d 78. Probable cause for a warrantless arrest is to be evaluated by the collective infor-

mation of the police engaged in a common investigation. *Van Ackeren, supra.*

With those rules in mind, we conclude on de novo review that the State sustained its burden of proving that law enforcement personnel had probable cause to arrest Nissen. It is true, as Nissen points out, that Brandon had made contradictory statements about the assault perpetrated upon her, that she had in the past made false statements to law enforcement personnel and engaged in criminal activity, that she failed to keep a scheduled appointment with Olberding, and that law enforcement personnel had not acted upon her assault complaint. But the findings upon the physical examination at the hospital; the recovery by law enforcement personnel of items of physical evidence corroborating the assault; and Nissen's own admissions, including his question to Olberding about keeping Brandon from fleeing, provided ample evidence to establish that he had at least aided and abetted in the felony of first degree sexual assault, Neb. Rev. Stat. §§ 28-205 and 28-319 (Reissue 1995), and committed the felony of kidnapping Brandon, Neb. Rev. Stat. § 28-313 (Reissue 1995). In so determining, we have noted Nissen's position that he was inside his house when he was seized. However, in view of the foregoing analysis, whether he was inside or outside his house at the time is immaterial. See *New York v. Harris,* 495 U.S. 14, 110 S. Ct. 1640, 109 L. Ed. 2d 13 (1990) (statement obtained while legally detained at police station after unconstitutional warrantless arrest in home not related to underlying illegality and thus not suppressible).

Neither is Nissen's contention that the arrest was pretextual of any significance. It is true that an arrest in reality effected as a pretext to search for evidence is unreasonable under the 4th and 14th Amendments to the U.S. Constitution. *State v. Vann,* 230 Neb. 601, 432 N.W.2d 810 (1988). However, the U.S. Supreme Court, citing *United States v. Robinson,* 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973), has observed that police conduct justified on the basis of probable cause is not invalidated by ulterior motives. *Whren v. United States,* 517 U.S. 806, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996).

As we have determined that Nissen's arrest was made with probable cause for aiding and abetting a sexual assault and a

kidnapping, it necessarily follows that the arrest is not rendered invalid because the officers also suspected Nissen of having killed Brandon and the other victims.

We begin by recalling that the voluntariness of a statement is to be tested by looking at all the circumstances, and the finding of the trial court will not be set aside unless clearly erroneous. *State v. Osborn*, 250 Neb. 57, 547 N.W.2d 139 (1996); *State v. Mantich*, 249 Neb. 311, 543 N.W.2d 181 (1996). See, also, *State v. Konfrst*, 251 Neb. 214, 556 N.W.2d 250 (1996) (other than findings of reasonable suspicion for stop and probable cause for warrantless searches, findings of trial court on motions to suppress to be upheld on review unless clearly erroneous). Moreover, in making this determination, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *Konfrst, supra*. With those rules in mind, we turn our attention to the three defects which Nissen claims make the two statements at issue inadmissible in evidence.

First, Nissen argues that the statements should have been suppressed because they were obtained as the result of deception. It is true that a statement must be suppressed if it is obtained by offensive police practices or is obtained under circumstances in which the free choice of the defendant was significantly impaired. *State v. Haywood*, 232 Neb. 97, 439 N.W.2d 511 (1989).

There is no question Nissen was deceived when falsely told that law enforcement personnel were aware that he had asked his wife to lie about when he returned to his house. Mere deception, however, will not render a statement involuntary or unreliable. *State v. Walker*, 242 Neb. 99, 493 N.W.2d 329 (1992). The test for determining the admissibility of a statement obtained by police deception is whether that deception produced a false or untrustworthy confession or statement. *Mantich, supra*; *Haywood, supra*. Thus, in *Walker, supra*, we held that the district court was not clearly wrong in finding that falsely telling the defendant that to have sex was not to have committed rape did not render the statement invalid. And in *Haywood, supra*, we held that the interrogator's deception in falsely telling the

defendant that his fingerprints had been found on the bag containing cocaine was not such an offensive police practice as to have affected the trustworthiness of the defendant's subsequent statements.

Inasmuch as Nissen knew that law enforcement personnel were aware of his prior contacts with Brandon, we cannot say the trial judge was clearly wrong in finding that the falsehood in question did not render Nissen's subsequent inculpatory statements false or unreliable.

Nissen next urges that he was improperly induced to make the statements at issue by having been told that doing so would assist him. But analysis of this claim is not warranted other than to observe that the officers conducting the interviews denied that such a statement was made. The conflict in the evidence was for the trial judge to resolve. *Konfrst, supra.*

Lastly, Nissen argues that the statements were rendered inadmissible because he was detained more than 48 hours without a judicial determination of probable cause to continue his detention.

Neb. Rev. Stat. § 29-410 (Reissue 1995) provides:

> Any officer or other person having in lawful custody any person accused of an offense for the purpose of bringing him before the proper magistrate or court, may place and detain such prisoner in any county jail of this state for one night or longer, as the occasion may require, so as to answer the purposes of the arrest and custody.

However, the U.S. Supreme Court, in *Gerstein v. Pugh*, 420 U.S. 103, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975), held that the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention following a warrantless arrest. In *County of Riverside v. McLaughlin*, 500 U.S. 44, 111 S. Ct. 1661, 114 L. Ed. 2d 49 (1991), the U.S. Supreme Court explained that prompt means within 48 hours, at the longest. In that regard, the Court wrote:

> This is not to say that the probable cause determination in a particular case passes constitutional muster simply because it is provided within 48 hours. Such a hearing may nonetheless violate *Gerstein* if the arrested individual can prove that his or her probable cause determination was

delayed unreasonably. Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake. In evaluating whether the delay in a particular case is unreasonable, however, courts must allow a substantial degree of flexibility. Courts cannot ignore the often unavoidable delays in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest, and other practical realities.

Where an arrested individual does not receive a probable cause determination within 48 hours, the calculus changes. In such a case, the arrested individual does not bear the burden of proving an unreasonable delay. Rather, the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance. The fact that in a particular case it may take longer than 48 hours to consolidate pretrial proceedings does not qualify as an extraordinary circumstance. Nor, for that matter, do intervening weekends.

500 U.S. at 56-57.

That there here existed no exigent or unusual circumstances which prevented the State from conducting a timely probable cause proceeding is strongly suggested by the fact that at 5:23 p.m., slightly more than an hour after Nissen was arrested, a hearing was convened before a county judge for the purpose of obtaining an arrest warrant for Nissen. Especially telling are the facts that one of the arresting officers was present at the hearing and that the hearing was held in the same building at which Nissen was being detained. Also suggesting that no extraordinary circumstances existed is the fact that at 3:55 p.m. on January 2, 1994, 47 hours 40 minutes after Nissen was arrested, the State conducted proceedings before Richardson County Court Clerk Magistrate Marjorie J. Eames, who seemingly purported to find that probable cause to continue Nissen's detention existed. The fact that a clerk magistrate has no authority to

make such a determination, Neb. Rev. Stat. § 24-519 (Reissue 1995), apparently escaped the State's attention, as well as that of the magistrate. Assuming without deciding that not holding a probable cause hearing was unreasonable in the instant case, the question becomes, what is the remedy? Nissen argues that the statements should be suppressed. However, other jurisdictions hold otherwise.

In considering the remedy for violating the 48-hour rule, some courts have interpreted the *McLaughlin* language quoted earlier as meaning that the failure to make a timely probable cause determination bears only upon the issue of the voluntariness of a confession, and is only one of several factors to be considered in that respect. See, *West v. Johnson*, 92 F.3d 1385 (5th Cir. 1996); *U.S. v. Perez-Bustamante*, 963 F.2d 48 (5th Cir. 1992), *cert. denied* 506 U.S. 1023, 113 S. Ct. 663, 121 L. Ed. 2d 588; *State v. Tucker*, 137 N.J. 259, 645 A.2d 111 (1994).

We adopt the reasoning in *West*, *Perez-Bustamante*, and *Tucker* that the failure to hold a probable cause hearing within a reasonable time is but one factor in the totality of the circumstances analysis to determine the voluntariness of the statements. As we concluded above, the State sustained its burden of proving that law enforcement personnel had probable cause to arrest Nissen. Therefore, if a probable cause hearing had been afforded Nissen within 48 hours of his detention, it is clear the State could have offered sufficient evidence that the continuing custody of Nissen would have been lawful. Moreover, we note that Nissen admitted within 6 hours of his detention his involvement in the crime, and his second statement added nothing of significance to his earlier statement.

Our finding that abundant evidence existed to justify Nissen's detention strongly supports the conclusion that the delay had little or no impact on the voluntariness of his statements. As discussed in the analysis regarding whether the deceptive comments or possible inducement coerced Nissen into confessing, the record does not reflect any such overbearing of Nissen's free will. Likewise, with the addition of the delay as a factor for the totality of the circumstances test, the record is absent any evidence that the failure of not holding a probable cause hearing within 48 hours, by itself or in conjunc-

tion with the other questionable police practices, overbore Nissen's free will.

Accordingly, it was not error for the January 2, 1994, statement or the December 31, 1993, statement to be admitted into evidence.

The record fails to sustain this assignment of error.

*Jury Selection.*

In the third summarized assignment of error, Nissen argues that because of the trial judge's improper comments during the selection of the jury, the trial judge erred in overruling Nissen's motion for mistrial.

We review this claim under the rule that the decision whether to grant a motion for mistrial is within the discretion of the trial court and will be upheld on appeal absent a showing of an abuse of discretion. *State v. Trackwell*, 244 Neb. 925, 509 N.W.2d 638 (1994); *State v. Morrison*, 243 Neb. 469, 500 N.W.2d 547 (1993).

During voir dire, Nissen questioned a panel of five venirepersons concerning his right not to testify or present evidence. After both parties passed the five venirepersons for cause, the trial judge remarked, in pertinent part:

Okay. I always feel kind of bad because I know we're at least sending one of you out of here with maybe a little distaste in their mouth. The thing I've got to worry about, you see, is saying too much, because the Court's got to go right down the middle of the road and the defendant's entitled to things and the State's entitled to things. For those 12 that are selected, I've always found — and I always go and talk to the jury after they've served and the process is over with — I've always found that a lot of the things that are probably running through your mind now are cleared up, and they're glad they've served. I might just mention this one thing, because you mentioned somethin' about the defendant's — it bothers a lot of people the defendant has a right not to take the witness stand. And I never did fully understand that even as a lawyer until I started tryin' cases and talkin' to jurors. And after the — especially criminal cases, these cases are tough. You know what I mean?

They're not black and white. Cases that go to trial are tough. And jurors want as much as they can get their hands on to help them make that decision. And they always ask what kind of a guy or what kind of a gal was he? Well, if the defendant takes the witness stand, if they've got a history that would suggest they're not a nice guy, the jurors take that frequently and hold it against him, even though it has nothing to do with the trial. Do you see what I'm sayin'? So we think in terms of, well, gosh, he didn't testify. That isn't the reason a lot of time they don't testify. Do you see what I'm sayin'? So you can't always look at things at face value. Sometimes there's other reasons why it's a good rule of law. And it just so happens our Constitution says they don't have to testify. And it becomes very important that you, as lay people, understand that rule and not hold it against the defendant, even though it may be tough because of your surface perceptions. Do you follow me? Well, we can't get into — That'd take a semester in law school to discuss that one little issue, and we can't do that during jury voir dire. So I feel kind of bad sometimes that the 12 will understand a lot of this by the time they're through, but the poor people that don't get picked as the 12 leave here frustrated with the system, even more than when they come in. So I hope you just kind of keep an open mind.

Nissen then unsuccessfully moved for a mistrial, claiming that the remarks improperly suggested that the reason he might choose not to testify was because he had a bad history.

Of the five venirepersons who were subjected to the trial judge's remarks concerning a criminal defendant's rights, four were stricken. Nissen did not testify or present evidence in his defense.

Prior to the jury's commencing its deliberations, the trial judge properly instructed that Nissen's failure to testify could not be considered an admission of guilt and must not influence the verdict in any way.

Neb. Evid. R. 513, Neb. Rev. Stat. § 27-513(1) (Reissue 1995), provides, "The claim of a privilege, whether in the present proceeding or upon a prior occasion, is not a proper subject

of comment by judge or counsel. No inference may be drawn therefrom." Rule 513(3) further provides, however, that "[u]pon request, any party against whom the jury might draw an adverse inference from a claim of privilege is entitled to an instruction that no inference may be drawn therefrom."

We have repeatedly written that a trial judge should carefully refrain from expressing any opinion of or commenting on the evidence. *State v. Privat*, 251 Neb. 233, 556 N.W.2d 29 (1996); *State v. Rodriguez*, 244 Neb. 707, 509 N.W.2d 1 (1993); *State v. Drinkwalter*, 242 Neb. 40, 493 N.W.2d 319 (1992). When the trial judge affects the credibility of a witness, either negatively or positively, the judge invades the province of the jury. *Rodriguez, supra*. More specifically, we wrote in *Hansen v. State*, 141 Neb. 278, 286, 3 N.W.2d 441, 446 (1942): "As a general rule, 'It is the duty of the court to abstain carefully from any expression of opinion or comment on the facts or evidence, not only in its charge to the jury * * * but also on the examination of witnesses and otherwise during the course of the trial. . . .' "

However, Nissen's characterization of the comments at issue does not represent them fairly. Read as a whole, they advised that while sometimes defendants do not testify because of an unfavorable history, perhaps unrelated to the events in question, there are other reasons; they advised that cases go to trial because they are not clear; and they admonished the jury to keep an open mind. Thus, while the trial judge's comments were certainly unnecessary and ill advised, they did not permit the jury to draw an unfavorable inference from Nissen's failure to testify and adduce evidence.

That being so, the trial judge did not abuse his discretion in overruling Nissen's motion for mistrial, and this assignment of error thus fails.

*Admission of Evidence.*

In the fourth summarized assignment of error, Nissen argues that the trial judge improperly admitted evidence that Brandon had reported she had been assaulted or kidnapped and that Nissen and Lotter perpetrated the offenses, and the content of certain telephone conversations a freelance journalist claims to have had with Nissen.

This aspect of our review is controlled by the rule that in proceedings where the statutes embodying the rules of evidence apply, the admission of evidence is controlled by rule and not by judicial discretion, except where judicial discretion is a factor involved in assessing admissibility. *State v. Lee*, 247 Neb. 83, 525 N.W.2d 179 (1994).

The evidence in question is that Brandon reported to the police that she had been assaulted, kidnapped, and raped by Nissen and Lotter; that she was seen to have been injured; that Nissen was told of Brandon's report and was questioned about it; and that Nissen admitted having removed Brandon's pants, admitted being disgusted when he learned Brandon was female, and stated that Lotter raped Brandon in the automobile Nissen was driving at the time.

Nissen claims that the foregoing evidence was wrongly admitted because it was irrelevant and thus inadmissible under Neb. Evid. R. 402, Neb. Rev. Stat. § 27-402 (Reissue 1995), which makes only relevant evidence admissible; that even if otherwise admissible, its probative value was substantially outweighed by the danger of unfair prejudice and thus excludable under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1995); and that, in any event, the evidence was rendered inadmissible because no hearing was granted as required by Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Reissue 1995). Rule 404 provides, in relevant part,

> (2) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

> (3) When such evidence is admissible pursuant to this section, in criminal cases evidence of other crimes, wrongs, or acts of the accused may be offered in evidence by the prosecution if the prosecution proves to the court by clear and convincing evidence that the accused committed the crime, wrong, or act. Such proof shall first be made outside the presence of any jury.

We deal first with whether rule 404(3) required a separate hearing. We most recently reviewed this matter in *State v. McBride*, 250 Neb. 636, 550 N.W.2d 659 (1996), wherein we held that proof in a rule 404(3) hearing that there existed pending charges did not provide clear and convincing evidence that the defendant had committed the charged crimes. In *State v. Brunzo*, 248 Neb. 176, 532 N.W.2d 296 (1995), we wrote that the hearing contemplated by the rule concerning a prior drive-by shooting need not be conducted prior to commencement of the trial, but could be conducted as part of the trial prior to admission of the evidence. And in *State v. Williams*, 247 Neb. 878, 530 N.W.2d 904 (1995), we held that as no objection had been made at trial, the receipt of evidence following a rule 404(3) hearing that the defendant had previously stabbed the murder victim was not properly before us, but even if it had been, we could not say admitting the evidence constituted an abuse of discretion.

However, none of those cases are applicable to the situation here presented. In the foregoing cases, the purpose of the questioned evidence was to show that the claimed prior crimes, wrongs, or acts actually took place; here, the purpose of the questioned evidence was not to show that Nissen had in fact assaulted, kidnapped, or raped Brandon, but to establish that Brandon's report claiming those events provided the motive for the murders which followed. Stated another way, the gravamen of the evidence was not that the claimed crimes took place, but that they were represented and reported by Brandon as having taken place. It is the report, not the occurrence or nonoccurrence of the claimed events, which provides the motive. Under that circumstance, rule 404(3) has no application.

That brings us to whether the questioned evidence was relevant. As the motive for the crime charged is relevant to the issue of intent, see *McBride, supra,* the answer is in the affirmative. Moreover, while the evidence may well have been prejudicial to Nissen's defense, it cannot be said that it was unfairly so. In the context of rule 403, "unfair prejudice" means an undue tendency to suggest a decision on an improper basis. That cannot be said to exist here. Whether Brandon's report provided a

motive for killing her was a legitimate matter for the jury to consider and resolve.

Eric Konigsberg, who was interested in writing about the crimes, testified that in the course of a telephone conversation with Nissen, Nissen said that he and Lotter went to the Lambert farmhouse to "scare the shit out of" Brandon; that after they had entered the bedroom, Nissen sat Brandon on the edge of the bed; that Lotter shot and Nissen stabbed her, but Nissen could not remember whether he stabbed her before or after she was shot; that Nissen talked to Lambert and gave her the baby to hold; and that Lambert was shot, as was DeVine.

Nissen asserts that the content of the telephone conversation should not have been admitted, as it was not properly established that he was the person with whom Konigsberg was talking. But we need not decide whether Nissen's identity was properly authenticated, as there was nothing in Konigsberg's testimony which came as a surprise to the jury, including the fact that Nissen had stabbed Brandon. Prior to Konigsberg's being called to the stand, the jury had heard from Harry David Foote, one of Nissen's fellow jail inmates, that while the two were sitting in a weight room and Nissen was talking about a variety of things, including how much he missed his family, he "blurted out in a low voice, 'If I hadn't have stabbed her, maybe [Lotter] wouldn't have started shootin'.'"

Thus, even if we were to assume that the telephone conversation had not been sufficiently authenticated, we would be unable to say that admitting the conversation into evidence would have constituted prejudicial error; since the evidence was cumulative, the error would have been harmless beyond a reasonable doubt. See *State v. Morris*, 251 Neb. 23, 554 N.W.2d 627 (1996) (erroneous admission of evidence harmless error and does not require reversal if evidence erroneously admitted is cumulative and other relevant evidence properly admitted, or admitted without objection, supports finding of trier of fact).

For the foregoing reasons, the record fails to sustain this assignment of error.

*Motion to Dismiss.*

In the fifth summarized assignment of error, Nissen argues that the trial judge wrongly overruled the motions he made at

the close of the State's evidence, and after he elected not to adduce any evidence, for dismissal of the charges of first degree murder committed while perpetrating a burglary with the intent to commit false imprisonment or witness tampering, on the ground that the evidence fails to support either of those theories of guilt.

Inasmuch as the jury acquitted Nissen of the first degree murder charges related to Lambert and DeVine, we need not, and do not, consider this assignment of error as to those deaths, for any error with respect to those charges would necessarily be harmless.

In considering the issue with respect to Brandon's death, we recall that a directed verdict is proper only where reasonable minds cannot differ and can draw but one conclusion from the evidence; that is to say, a directed verdict is proper only where an issue should be decided as a matter of law. See *State v. Hirsch*, 245 Neb. 31, 511 N.W.2d 69 (1994). Thus, if there is any evidence which will sustain a finding for the party against whom the motion for directed verdict is made, the case may not be decided as a matter of law, and a verdict may not be directed. See *id.*

First degree false imprisonment is committed when one "knowingly restrains or abducts another person . . . under terrorizing circumstances or under circumstances which expose the person to the risk of serious bodily injury." Neb. Rev. Stat. § 28-314 (Reissue 1995). Nissen confessed to the following, which was introduced at trial: He transported Lotter to the Lambert farmhouse. He and Lotter got out of the car, and Lotter had the gun in his hand. Lotter kicked open the door to the house and they went in. They discovered Brandon on the floor by the foot of the bed trying to hide. Brandon was made to get up off the floor, and then Brandon sat on the bed. A loud discussion ensued while Lotter pointed the gun toward the bed. Lotter then shot Brandon.

Intent sufficient to support a conviction for burglary may be inferred from the facts and circumstances surrounding an illegal entry into improvements on real estate. *State v. Vaughn*, 225 Neb. 38, 402 N.W.2d 300 (1987); *State v. Coburn*, 218 Neb. 144, 352 N.W.2d 605 (1984). Thus, contrary to Nissen's posi-

tion, sufficient evidence was presented from which a jury could reasonably infer that Nissen, either alone or while aiding and abetting Lotter, intended to restrain Brandon, under terrorizing circumstances which exposed her to the risk of serious bodily injury, at the time he and Lotter broke into and entered the Lambert farmhouse.

That brings us to the matter of witness tampering, which occurs when one, "believing that an official proceeding or investigation of a criminal matter is pending or about to be instituted . . . attempts to induce or otherwise cause a witness [or] informant . . . to," among other things, "[w]ithhold any testimony [or] information . . . ." Neb. Rev. Stat. § 28-919 (Reissue 1989). For the purpose of this statute, a witness is anyone who has knowledge of a relevant fact or occurrence sufficient to testify in respect to it. *State v. McCoy*, 227 Neb. 494, 418 N.W.2d 250 (1988).

The evidence that Nissen went to the Lambert farmhouse to scare Brandon and that a loud discussion ensued before she was killed enabled the jury to conclude beyond a reasonable doubt, if it so chose, that Nissen, either alone or while aiding and abetting Lotter, intended to persuade Brandon to withhold any further information concerning the rape she had reported. Beyond that, under the evidence the jury could well conclude beyond a reasonable doubt that Brandon was killed while being falsely imprisoned to keep her from giving further information about the claimed assault; after all, killing a witness is the ultimate means of silencing that witness.

The record fails to sustain this assignment of error.

*Jury Instructions.*

In the sixth summarized assignment of error, Nissen urges that the trial court improvidently instructed the jury on each of the five theories of first degree murder pled by the State, refusing to instruct the jury as he requested concerning those theories, giving certain instructions related to those theories, refusing to submit special verdict forms related to those theories which would have required the jury to specify the element of each crime it found to exist, and improperly instructing the jury on the meaning of "premeditated."

With the exception of the instruction defining premeditated, Nissen's arguments reiterate the premises and positions resolved adversely to him earlier in this opinion, and therefore require no further analysis.

As to the remaining issue, the trial judge instructed: " 'Premeditated' is defined as forming the intent to act before acting. The time needed for premeditation may be so short as to be instantaneous provided that the intent to act is formed before the act and not simultaneously with the act." There are unquestionably more elegant ways of correctly defining the term, for example, as Nissen tendered, "conceived or thought of beforehand; already meditated upon before doing the act." But the trial judge's definition was not incorrect. Indeed, a number of our opinions define the term in essentially the same words as used by the trial judge. E.g., *State v. McBride*, 250 Neb. 636, 550 N.W.2d 659 (1996); *State v. Drinkwalter*, 242 Neb. 40, 493 N.W.2d 319 (1992); *State v. Batiste*, 231 Neb. 481, 437 N.W.2d 125 (1989). Inasmuch as the instruction given in this regard is correct, no error can be predicated upon the trial judge's refusal to give Nissen's requested instruction. See *State v. Hernandez*, 242 Neb. 78, 493 N.W.2d 181 (1992).

The record fails to sustain this assignment of error.

*Jury Deliberations.*

In the seventh summarized assignment of error, Nissen argues that the trial judge wrongly failed to sustain his motion for mistrial on the ground that the jury engaged in misconduct during its deliberations.

After the jury panel was selected and prior to its being sworn, the trial judge talked to the panel about the need to not discuss the case with each other or others and not expose themselves to outside information, saying:

> So I'm really gonna emphasize the fact that you shouldn't visit with your husbands, your best friend, with each other, with the neighbor, listen to the television or read the newspaper. And of course, that's the reason for sequestration. I've always felt jurors were, you know, mature and adult and intelligent enough that they could sort through all that. So we're not gonna do any sequestration. We're gonna let

you come and go, and then while you're down there, we'll ask you to stay there from Monday through Friday. . . .

. . . Well, anyway, we're not gonna sequester you, but we do ask you keep, you know, keep the faith with us on that other business.

At various times during the course of the proceedings, the trial judge admonished the jury not to visit about the case with each other or others. In submitting the case to the jury at approximately 11:15 in the morning, the trial judge instructed that until it reached a verdict, it would deliberate until 5 o'clock in the afternoon, or later if it wished, when it would "be conducted by the bailiff to [the] hotel for sequetration [sic]" and reconducted to the jury room the following morning to resume deliberations. The trial judge further "admonished that, during any periods of time that you are not all together in the jury room for deliberations, you shall not discuss this case with any person or with each other until you reconvene."

Having not finished deliberations, the members of the jury were kept together and provided with lodging. One juror complained in a note to the court that the husband of another juror had stayed in the latter's room the previous night. The complaining juror testified that her concern was that she was not even allowed to speak with her own husband on the telephone; however, she later stated, "I don't have a problem with [the offending juror]." The offending juror was sworn and admitted that the claim was true, but said that her husband had no interest in the case and that the two had no conversation about it except as to when the jury might reach a verdict. The juror also stated that she had mentioned her husband's staying the night to the clerk of the district court, the bailiff, and a security guard. These functionaries, however, denied on oath that such had occurred. The husband also testified on oath that he was not interested in the trial and that there was no discussion between his wife and him about what went on during the deliberations or about what went on during the trial, except that the wife had told him she would probably be finished deliberating the next day. The trial judge then instructed the entire jury that sequestration meant that during deliberations, the jury was to be isolated from the rest of the world.

Although Nissen characterizes the offending juror's behavior as misconduct, such is not the case. While when submitting the cause the trial judge instructed the jury that it was to be sequestered, after advising earlier that such would not occur, at no time until after the untoward event took place did the trial judge think to tell the jury what sequestration meant. The jury should have been instructed at the time the cause was submitted that, in the context used, sequestration meant that the jury would be in the custody of the court throughout its deliberations, that no jury member was to have any contact with anyone other than each other and the court personnel having charge of them, and that no member was to be exposed to any outside information about the case such as might be found in newspapers, magazines, radio programs, television programs, or electronic data bases.

Rather than jury misconduct, it is judicial trial error that is involved. Indeed, how those having charge of the jury could have permitted a nonjuror to enter any juror's room is difficult to comprehend. One of the major purposes of assigning personnel to take charge of a jury is to see to it that its members are protected from outside influences and kept safe, and it is a trial judge's responsibility to see that such is done. See *State v. Menuey*, 239 Neb. 513, 476 N.W.2d 846 (1991) (Neb. Rev. Stat. § 29-2022 (Reissue 1995) provides in effect once case submitted, jury to have no communication with nonjurors). Unhappily, this is the second time in the short span of 5 years that we have been confronted with situations in which personnel having charge of jurors appear to have had less than adequate training and less than a full appreciation of the role their duties play in securing a criminal defendant's constitutional right to a fair and impartial trial. See *Menuey, supra* (following submission of case, bailiff permitted discharged alternate juror to have lunch with jurors and to enter jury room to retrieve personal items). See, also, *Simants v. State*, 202 Neb. 828, 277 N.W.2d 217 (1979) (fair trial before fair and impartial jury basic requirement of constitutional due process). We should not be presented with a similar failure of duty again.

Having made the foregoing observations, we turn our attention to the task of determining whether the dereliction of duty

which took place here requires that Nissen be granted a new trial. See *State v. Cisneros*, 248 Neb. 372, 535 N.W.2d 703 (1995). While it is trial error and not jury misconduct which is involved, the fact remains that there was improper contact between a juror and a nonjuror. Thus, in making that determination, we look to jury misconduct cases to determine the appropriate remedy.

In the context of jury misconduct, we have written that whether the misconduct occurred is largely a question of fact, and the jurors may be questioned as to what happened during their deliberations. The determination as to whether the misconduct was prejudicial to the extent that the defendant was denied a fair and impartial trial is a question for the trial court, which question is to be resolved upon the basis of an independent evaluation of all the circumstances in the case. *State v. Steinmark*, 201 Neb. 200, 266 N.W.2d 751 (1978). Consequently, we review this issue under a clearly erroneous standard as to the facts and under an abuse of discretion standard as to any finding of nonprejudicial misconduct.

When an improper communication with a juror or jurors is shown to have taken place in a criminal case, a rebuttable presumption of prejudice arises, and the burden is on the State to prove that the communication was not prejudicial. *Simants, supra*. It is the almost universal rule that unauthorized communications between jurors and third persons or witnesses during the course of the jury deliberations are absolutely forbidden and invalidate the verdict unless their harmlessness is made to appear. See *id*.

Here, the testimony demonstrates that the conversations had between the juror and her husband had nothing to do with the case except as to when a verdict might be returned. As there was no extraneous prejudicial information improperly brought to the juror's attention, the State has met its burden of proving that Nissen was not deprived of a fair and impartial trial by the conduct between the offending juror and her husband.

Nonetheless, Nissen urges that he is entitled to a new trial because the trial judge failed to make factual findings adequate to enable us to conduct our review.

In remanding the cause for a further hearing on the matter of jury misconduct, we wrote in *State v. Steinmark, supra*:

> When an allegation of misconduct is made, and is supported by a showing which tends to prove that serious misconduct occurred, the trial court should conduct an evidentiary hearing to determine whether the alleged misconduct actually occurred. If it occurred, the trial court must then determine whether it was prejudicial to the extent the defendant was denied a fair trial. If the trial court determines that the misconduct did not occur, or that it was not prejudicial, adequate findings should be made so that the determination may be reviewed.

201 Neb. at 204-05, 266 N.W.2d at 754.

We reiterated that rule of judicial process in *Hunt v. Methodist Hosp.*, 240 Neb. 838, 485 N.W.2d 737 (1992). But in this instance, the trial judge's failure to make express findings does not thwart our ability to conduct a meaningful review. There is here no dispute about the fact that a juror had her husband in her room and no dispute that nothing of significance was said by the husband to the wife. Under such a circumstance, we conclude on review, even in the absence of express findings of fact, that the trial judge's implicit finding that nothing significant was said by the husband to the wife is not clearly wrong. Nor is the trial judge's implicit finding that the complaining juror would be able to remain impartial clearly wrong. We further conclude that under the circumstances, the trial judge did not abuse his discretion in not granting Nissen a new trial.

The record fails to sustain this assignment of error.

*Burglary Sentence.*

In the eighth and final summarized assignment of error, Nissen urges, in essence, that while it is impossible to know whether the jury found Nissen guilty of first degree purposeful murder or felony murder in the killing of Brandon, it is clear that if the jury found that the killing constituted felony murder, then the burglary conviction merges with the felony murder, and the consecutive sentence imposed for the burglary was error and should be set aside.

In *State v. Olsan*, 231 Neb. 214, 436 N.W.2d 128 (1989), in the course of holding that first degree false imprisonment was not a lesser-included offense of robbery, we wrote that the constitutional prohibition against double jeopardy not only protects against a second prosecution for the same offense after acquittal or conviction, but also protects against multiple punishments for the same offense. Thus, when a defendant is convicted of both a greater and a lesser-included offense, the conviction and sentence on the lesser charge must be vacated. Those observations were reiterated in *State v. Sardeson*, 231 Neb. 586, 437 N.W.2d 473 (1989), a case in which we held that burglary was not a lesser-included offense of theft by receiving stolen property, nor the latter a lesser-included offense of the former.

Under the murder and burglary statutes set forth earlier, it is clear that as this case was charged and tried, burglary is a lesser-included offense of felony murder in the sense that it would have been impossible for the jury to find that Nissen committed felony murder without also finding that he committed the burglary. See *State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993) (to be lesser-included offense, elements of lesser offense must be such that it is impossible to commit greater offense without at same time having committed lesser offense).

Thus, the record supports this assignment of error. However, since we cannot know if in the death of Brandon the jury found Nissen guilty of purposeful or felony murder, it is not necessary that the burglary conviction be vacated and set aside; such need be done only with respect to the sentence for that crime. Thus, even if the jury found that Nissen, either alone or while aiding and abetting Lotter, committed felony murder with respect to Brandon's death, he will not be subjected to double punishment by also punishing him for the burglary through which the felony murder was perpetrated.

## CONCLUSION

For the foregoing reasons, we modify the judgment below by vacating and setting aside the sentence of imprisonment and fine for the burglary and, as so modified, affirm it.

AFFIRMED AS MODIFIED.